There is something in particular that really bothers me in this case and is making it hard to figure out how to go on it. Help me with it. She has had terribly serious medical occurrences. She's had a massive brain hemorrhage. The treatment for it required a shunt and she's had subsequent brain surgery since. Multiple brain surgeries. She ought to be in absolutely awful shape. But I read the meds and I read what she says and it sounds like she's just done miraculously well. If she's done all that miraculously well, why isn't there substantial evidence on the record for what the ALJ concluded? Miraculous recovery doesn't mean a recovery sufficient to be able to return to work. Okay, why isn't it? Well, we have a total of 13 medical assessments in this case from non-agency examiners. The bulk of whom on the physical side are treating doctors. We have six mental assessments that are non-agency assessments for the Department of Social and Health Services. A total of 13. Twelve of these 13 assessments, all of which come after the agency assessments, all restrict Ms. Gundy from being employable for the reasons both physical and mental. And what's remarkable in this case is that the ALJ rejected every single one of them in favor of assessments that were done by the agency only a very short time after her aneurysm in June of 2003. She has a variety of physical and mental problems. All of the physical assessments that were non-agency assessments limited her to the ability to do sedentary work, contrary to the assessment of the ALJ that she could do light work in his RFC determination. And what's even more interesting in this case is that this ALJ had two hearings with this woman in front of her. The first decision he rendered got reversed by the AC and sent back for a second hearing. In the first hearing he found that she had a sedentary RFC until September 8, 2006, and after that a light RFC. In the second decision he finds that she has a light RFC for the entire period of time with no explanation of why his second decision is different from his first decision. But as far as her physical problems are concerned, she has fatigue, she has an inability to concentrate for extended periods of time, and she has mental limitations, mainly in the area of moderate to marked to severe limitations on her ability to complete a work day in a normal fashion, to even get to work and attend work on a regular and consistent basis. And these were issues that were not addressed by the ALJ. He rejected every single one of these in favor of assessments by the agency that were done in February 2004, eight months after the onset of the aneurysm, and mental health that was done just a few months later. Dr. Quint, who did the agency physical assessment, is not a specialist in the area of the physicians who were either treating this woman or who were doing surgery on her at Harborview. Do I understand correctly, her treating doctor is a Dr. Grayson? Yes, Grayson and Agon-Biotta. And they opine that she can do sedentary work? With restrictions. So then if we agree with you, what happens? We send this back and say, assume she has the capacity to do sedentary work? Well, in the physical side, remember, this case has got two sides to it. You've got the physical side, you've got the mental side. With the exception of the agency doctor, who is a urologist, who's basically had his opinion accepted over all the treating physicians, including the neurosurgeons, all of whom rate her at sedentary or less, we've got that issue. Yes, you send it back on that issue. So then there would be, what happens, she's still not able to work even though her own doctor says she can do sedentary work? Well, remember, sedentary is just the physical side of the equation. We've got the mental side as well. And we've got six different mental health assessments, non-agency assessments, every one of which put significant restrictions on her from a psychological standpoint to a degree that when we asked the vocational expert how these limitations would impact this woman's ability to work, the testimony both times by a vocational expert was that work was precluded based on those mental health limitations. The judge said there were no significant mental health limitations, despite the six reports to the contrary. And even Dr. Ether, who did the very first non-agency mental health assessment, who probably had about the most benign of all of the assessments, indicated that she was moderately impaired in her ability to tolerate and withstand the pressures and the stress of a normal work day. If she's moderately impaired mentally, at least according to some evidence, some substantial evidence on the record as a whole, and she's restricted to sedentary work, then why can't she do easy sedentary work? Because if she's moderately impaired, if you look at the POMs, they indicate that a moderate impairment is a significant impairment. There's also marked and severe impairments in addition. You need to consider the whole body of psychological work. One of the things we had concerns here is that the ALJ selectively picked out bits and pieces of the record to support a finding of non-disability. But you can't do that, and you have bits and pieces from every report that if you wish to say, okay, this person doesn't have a really big problem, how do you square that with the fact that when you take a look at the global assessment of the mental health professionals, when they come to a conclusion that this woman is severely limited, they don't base their whole assessment based on a single item, as did the ALJ in a report. The combination of the moderate mental impairment and the sedentary work limitation does not rise to disability under the grid, so you have to make a judgment, right? No, you have to use a vocational expert. Those are what the cases say. The grids are not supposed to be used unless the physical limitations are the only limitations, or if the mental limitations are not that significant. In this case, we have very, very significant mental health limitations rated not just in the moderate level, but the marked level and the severe level. When we asked the vocational counselors, and remember, the judge didn't ask these questions. The only thing he wanted to know was job numbers, that there were three jobs the agency came up with, and that's all he wanted the VE for. But when we asked for a combination of impairments, the V in both cases said she could not work. Thank you. Thank you, Mr. Teller. Good morning. Good morning. May it please the Court, Your Honors. Willie Lee for the Commission of Social Security. I'd just like to clarify a few things before continuing to answer your questions. One, I disagree that all of these, and there's a broad record of many medical opinions, not all of those doctors opine that she was limited to sedentary work. Most notably was Dr. Britz, the treating neurosurgeon who performed the surgeries. Counsel, when I read her report, what it looked like to me was repeated brain surgeries and just the ordinary impairments you would expect as a result, but to a much lesser degree than most people would have. Right. And when I read the ALJ's report, it looks like he just didn't like her because she used to be a meth head. It's really hard to believe she could be a work. And then when I read what kind of work she's supposed to be able to do, cleaner or housekeeper, my gosh, that stuff is physically really taxing. It's more taxing than the kind of work that she used to do, bartender, waitress, and barista, that she can't do anymore. Not only do you have to be on your feet to be a cleaner or housekeeper, you have to do a lot of bending and scrubbing. Well, if you try to do some at home, it's really hard. Sure. Well, there are two other jobs also, Your Honors, photocopying machine operator and collator operator. Stay on your feet all day. Sure. But that's in the alternative to the GRITS finding. And, of course, all this assumes that the RFC was proper in the first place. But as to your concern as to her brain surgeries, I would note that Dr. Britz, who performed one of them, said that the latter one in 2006 was elective. And he said that occurred in June 2006. That was elective in the sense that it looked like there was re-channeling going on in the brain, so in order to avoid another hemorrhage or high risk of a hemorrhage, he created a clot there. But the alternative would have been take a chance on it, so it was elective whether to do it, something like that? I'm not sure. Have I got the right surgery? Yes, yes. I'm not sure the exact details of that. It's elective in the sense where the surgeon says, well, something really bad may happen if you don't get the surgery, but I can't tell you you have to get it. You're the patient. It's up to you. That happened in June 2006. And in October, Dr. Britz said that she was completely normal, could resume normal activity except for diving. I mean, that was the only limitation he placed on her. So I fully acknowledge that she's been through hell. But the key issue in all these cases, Your Honors, is what happens afterwards and how did she do? I asked Mr. Talbot, okay, let's assume she's sedentary. What then? He says, well, the ALJ didn't take sufficient account of her psychological problems. Right. What's the answer to that? Two parts to that, Your Honor. Given her age, and I think this is what Mr. Talbot's alluding to, from 2003 to 2006, even if she was limited sedentary, and assuming that the mental RFC is the same, she'd be found not disabled under the GRIDS anyway. That's, I looked it up, GRID Rule 201.18, sedentary with a limitation of simple routine tasks as the RFC. Now, in 2006, when her age changed to a higher age category, then it would have to go to a VE. But I would, as Mr. Talbot pointed out, those questions, what he assumes her mental limitations to be, they were asked of a second VE anyway. So that testimony is already developed, assuming that you accept their interpretation of what her mental limitations are. You're saying that the ALJ asked the vocational expert to assume her psychological limitations? That was not, that testimony was not part of the record, no. That's what he's saying is the problem. It's a problem, I disagree it's a problem because the ALJ found his version of the mental RFC, assuming that's true. There's, and the key to the RFC, to his reliance on the GRIDS and the VE testimony at Step 5, was the assumption that unskilled work sufficiently accommodates the limitation of simple routine tasks, which is the mental RFC that the ALJ found. So, and that is explained in 20 CFR sections 404.1568A and the Title 16 equivalent 416.968A. It explains simple duties, or I'm sorry, unskilled work involves only simple duties learned in a short period of time, and that was the basis for the ALJ's finding that the mental RFC here, simple routine tasks, did not erode the occupational base, and therefore he could rely on the GRIDS, and assuming that these light unskilled jobs that were identified in the record, assuming that they're light and unskilled, which they are, and you can verify that in the dictionary of occupational titles, those presumably already accommodate the limitations that ALJ identified. Now, I would note, there's, the ALJ found that she had a limitation of simple routine tasks. It's not as if the ALJ found that she had no mental limitations. Is it true that the doctor that the ALJ used for the agency-obtained medical opinion was a urologist? I was hoping that that was a typo and it meant neurologist. A urologist would look at her bladder, her kidneys, her urinary functions, and if there's anything irrelevant, that's it. I didn't look into that issue because I had argued that his opinion was based on, this is Dr. Quint, his opinion was based on his direct observations of what she could do. Now, mind you, it was in October 2004. But if he's a urologist, the things that he'd really be expert in looking at to see what she could do is urinating. Right. Not one of her problems. I'd hope that was a typo, but I can't verify whether it was or not. But hardly anybody survives the hemorrhage and the surgery she's had without major mental impairment. And it sounds like what the agency relied on is a doctor who's not expert in major mental impairment. That's why I asked about the possible hoped-for typo. Well, Dr. Quint, the urologist, I'm assuming, only looked at her physical part. The mental part was evaluated by several other doctors, one of them being Dr. Harrison, a medical consultant in 2004. There was also Dr. Rasmussen, January 2004, who assessed a global assessment of function of 65, which is moderate to mild mental functioning. So to the extent Dr. Quint, the urologist, was relied upon, it was only for the physical part, and his opinion was valid because it was based on his direct observation of what she could do. So my point was it doesn't really matter what she had and how she got there. He observed her doing these things that led to being able to sit. She had full strength, full motion, no physical deficits. So I would argue it's irrelevant what his specialty was because it was just his observation. His report was just based on his observation. I don't have much more to contribute. I think Dr. Rasmussen said she was in ninth percentile on her auditory immediate memory, sixth percentile on auditory delayed memory. It means if you're a boss and you tell her to do something, she doesn't remember what she's supposed to do by the time she starts doing it. Right. I would argue that the limitation of simple routine tasks in the mental RFC sufficiently accommodates that. But Dr. Rasmussen also pretty much concluded she should return to work in order to, because, number one, She thought that would help with depression if she could work. Right. But that's also an indication that she could work. As I said, I don't have much more to contribute, Your Honors. There was many medical opinions. They each had conflicting results and conclusions, but that's precisely the ALJ's job to weigh all these conflicts, and we believe substantial evidence supports the decision. Thank you very much, Mr. Lee. Thank you. Mr. Talbot, back to you. I'd like to clarify a few things. There was a question asked, and this came up by the judge, on this notion of elective surgery. If you look up in the medical literature, elective surgery is a surgery that is a name that's put on a surgery after an emergent or an acute admission to a hospital. If you have somebody who is in an accident, has a significant trauma like this lady, is taken on an emergent basis to the hospital, airlifted to Harborview, she's unconscious, she goes through surgery, that's emergency surgery. When you are discharged, every surgery after that becomes what they call elective, because at the end of the day, you have a choice. You can either receive the surgery or not. You can refuse it. Even if it's a surgery your doctor says will save your life, you have a choice. That's why they call it elective surgery. It doesn't mean that it's meaningless or harmless or isn't really going to do much. Elective surgery is a surgery that the patient has a choice, regardless of the outcome, if the surgery isn't done. We cited a reference, and this is regarding Dr. Quinn. He is a urologist. You'll find the citation to that on page 15 of our brief. There's a link on that page, an Internet link that gives Dr. Quinn's credentials, and it's not a typo. He is a urologist. He is not a head doctor or a neurosurgeon. As far as the work that was found by the ALJ as part of the RFC, these were what's called SVP-2 jobs. These are unskilled jobs, which by definition are simple, repetitive, typically repetitive-type jobs. But that's not the only mental health limitation this lady has. There's a whole body of evidence that indicates that this woman has severe mental decrements. And even the mental RFC determination that was done by the agency says she has moderate limitations in her ability to withstand the normal stresses and difficulties of the workplace. And that's a pretty significant limitation. And when that was added to the mix with the vocational expert at both areas, that in combination with the other mental health limitations, they precluded gainful activity. Thank you, Mr. Talbot. Mr. Lee, thank you too. The case just argued is submitted. Good morning, gentlemen.
judges: Kleinfeld, Tashima, Silverman